

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JAM:AAS/LZ/ADR
F. #2021R00608

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 20, 2024

By ECF

The Honorable Ramon E. Reyes, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Domagoj Patkovic
                Criminal Docket No. 24-317 (RER)

Dear Judge Reyes:

      The defendant Domagoj Patkovic was arrested earlier today at his residence in Portland, Oregon and will be presented in the District of Oregon on the above-referenced indictment, which charges him with conspiring to make and making threats concerning explosives, contrary to 18 U.S.C. §§ 844(n) and 844(e); conspiring to transmit and transmitting threatening communications, contrary to 18 U.S.C. §§ 371 and 875(c); and conveying false information concerning explosives, contrary to 18 U.S.C. § 1038(a)(1).  For the reasons set forth below, the government respectfully submits that the Court should enter a permanent order of detention pending trial because the defendant presents a danger to the community and a serious risk of flight.  See 18 U.S.C. § 3142(f)(2).

I.      The Offense Conduct[1]

      Beginning at least as early as May 2021, the defendant and others made violent threats, including threats to detonate explosive devices, on phone calls to Jewish hospitals and care centers within the Eastern District of New York and elsewhere.  The defendant himself made threats on at least six separate occasions to hospitals and on a call with local law enforcement who had responded to a 911 notification from one of the hospitals.  The defendant livestreamed the threatening calls to others on channels (or "servers") on the online social media and messaging service Discord.

---

[1] The relevant facts, as they pertain to the defendant's pretrial detention, are proffered herein.  See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings).

The threatening calls targeting Jewish hospitals and care centers in the New York metropolitan area included the following:

- On May 18, 2021, at approximately 1:30 a.m., the Assistant Director of Nursing at a Jewish hospital in Queens, New York ("Victim-1") received an anonymous phone call at the nursing office phone. The caller stated that he had planted bombs around the hospital and, using an anti-Semitic slur, stated that he wanted to "kill all k***s." At the conclusion of the call, the Assistant Director of Nursing relayed this information to a police officer from the New York City Police Department ("NYPD") who was detailed on-site. The NYPD attempted to return the call to the originating phone number without success. NYPD personnel responded to the hospital and conducted a full floor-by-floor, room-by-room sweep of all 13 floors of the building to check for explosives. NYPD Emergency Services Unit ("ESU") was also notified of the incident and responded. Results of the sweep were negative.

- On May 18, 2021, close in time to the above incident, the on-call nurse at a network of hospice and senior care centers with locations in Manhattan, Brooklyn and Queens, New York ("Victim-2"), received a phone call from an unknown telephone number. The call was made to the main Victim-2 number but was forwarded to the nurse's home on Long Island. The caller stated that "bombs are all over your facility and all those k***s are gonna go skyrocket up into the sky for Allah." Victim-2 reported the threatening call to the NYPD. Because the anonymous caller had not specified a location where the purported attack would take place, NYPD did not respond onsite.

- On May 24, 2021, at approximately 12:15 a.m., Victim-1's Assistant Director of Nursing received another anonymous phone call. This time, the caller stated that he had planted bombs around the hospital and that "I'm gonna kill you k***s." The Assistant Director of Nursing recognized the voice from the previous threatening call to Victim-1 on May 18, 2021. Once again, NYPD personnel responded and conducted a floor-by-floor and room-by-room search of all floors of the hospital, with negative results.

- On September 15, 2021 at approximately 12:50 p.m., personnel at a Jewish hospital in Queens, New York ("Victim-3") received an anonymous phone call. The caller stated that he had placed backpacks containing C-4 explosives around the hospital building. NYPD personnel responded and conducted a sweep of the second floor of the building—where the threat had been received—with negative results.

- On September 15, 2021, at approximately 1:17 p.m., the phone operator at a Jewish hospital in Nassau County, New York ("Victim-4") received an anonymous phone call. The caller identified himself as "Abrahimavich"

2

and stated that he had placed "C-4 in maintenance closets" at the hospital. He further threatened, "I'm gonna blow you to bits you f***ing k***e b***h." The phone operator called the Nassau County Police Department for assistance. Shortly thereafter, at approximately 1:22 p.m., personnel at the NYPD 911 call center placed a call to the originating number and spoke with an individual who sounded to be, and who claimed to be, the caller from the threat call. The individual identified himself as "Abrahimavich" and claimed, "I just called the hospital requesting my f***ing million dollars or I'm going to blow this k**e f***ing b***h to the sky." He provided Victim-4's address. Officers from the Nassau County Police Department responded to the scene, causing lockdown of the entire hospital as well as partial evacuation. Officers and security personnel searched the building with negative results.

- On September 17, 2021, at approximately 8:06 p.m., a Victim-2 nurse received an anonymous call forwarded from Victim-2's main line. The caller identified himself as "Timothy," claimed that he worked in housekeeping, and stated that he had placed "15 backpacks full of C-4 with cellphones strapped to them in all of your maintenance closets." The caller further threatened, "I'm gonna blow you k***s sky high." When asked which location the caller was referring to, the caller asked whether he was speaking with Victim-2. Victim-2 reported the threatening call to the NYPD. NYPD officers responded and searched the hospital with negative results.

Notably, the September 15, 2021 call with the NYPD call center was livestreamed by the threat caller on Discord and the livestream was recorded. At the conclusion of the call, the defendant revealed himself on video as the perpetrator of the call, as depicted in the screenshot below.



3

On or about July 21, 2023, agents from the Federal Bureau of Investigation ("FBI") interviewed the defendant, responding to the defendant's initial contact to provide information regarding an individual with whom he had a dispute. The interview was recorded. During the interview, the defendant admitted to participating in swatting and bomb threat calls with others.[2] He also admitted knowledge of at least one bomb threat call to a Jewish medical center on Long Island, and shared details with law enforcement related to the call, but claimed that he never spoke on the calls and that others had recreated his voice through artificial intelligence. Additionally, the defendant threatened to murder an individual ("Individual-1") who had listened to at least some of the bomb threat calls the defendant had been participating in. The defendant stated, in sum and substance, "I don't want to say death threat, but I would f***ing shoot that f***ing fat half [indecipherable] in the head with a gun if I could. For the record, I didn't say that. If I could, you know, if I could execute that guy I probably would."

In an unrelated incident, law enforcement obtained the below photograph showing the defendant crouching above a man's unconscious body, making the "Sieg Heil" (Nazi salute) hand gesture. The defendant voluntarily admitted to his involvement in assaulting the man, although he claimed that it was in defense. The defendant stated, "this guy died because he came at me with a f***ing whip. . . . I had a picture where I 'Sieg Heil' in front of this guy's passed out body. . . . And nothing ever came of it." An investigation by local law enforcement in Portland, Oregon revealed that the man later died under apparently separate circumstances.



---

[2] "Swatting" is the false reporting of an ongoing emergency or threat of violence intended to prompt an immediate law enforcement response from police tactical units, including SWAT teams.

4

II.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are required to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). As discussed below, these factors weigh heavily against pretrial release.

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also LaFontaine, 210 F.3d at 130-31. In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d at 437 (We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.    The Statutory Factors Weigh in Favor of Detention

All relevant factors in the detention analysis underscore that the defendant presents both a severe and ongoing danger to the community and a serious risk of flight if released on bond.

A.      The Nature and Circumstances of the Offense Charged

The defendant's criminal conduct critically undermined public safety. Together with others, the defendant perpetrated numerous bomb threats on Jewish hospitals throughout the New York metropolitan area, causing repeated responses by law enforcement and, at least on one occasion, partial evacuation of a facility. This pattern of conduct diverted law enforcement resources—including bomb technicians—from actual emergencies and, in the case of the partial evacuation, unnecessarily risked the wellbeing of the hospital's patients. Further, the targeting of Jewish care centers, as well as the hateful language he used during the threatening calls, reflected the defendant's religious animus against Jews and his desire to act on that animus.

5

Underscoring the seriousness of the defendant's conduct, the charges in the indictment carry up to 155 years of total incarceration—providing the defendant with extra incentive to flee. See United States v. Jackson , 823 F.2d 4,7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (l0th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

  B.  The Weight of the Evidence

The weight of the evidence against the defendant is strong. In addition to the defendant's statements to the FBI in which he admitted to participating in a swatting and bomb threats ring, multiple witnesses have identified the defendant as a leader of the conspiracy who himself spoke with the victim institutions during the threatening calls. Forensic evidence, which is partially summarized above, includes a video from Discord in which the defendant acknowledges speaking during the September 15, 2021 call with the NYPD call center. Where, as here, the evidence of guilt is strong, it provides "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

  C.  The Defendant's History and Characteristics

Although the defendant has no recent convictions, he has previously engaged in similar conduct. On or about May 5, 2018, Orange County, California Sheriff's Department personnel responded to the defendant's claim on Facebook that he had found a bomb on a bus. When interviewed, the defendant claimed that he had constructed the device—which was not a bomb—as a joke. Moreover, the defendant's criminal history includes convictions for brandishing a firearm replica in 2011, carrying a concealed dagger in 2012 and presenting a false identification to law enforcement in 2012, demonstrating his lack of regard for safety and the rule of law.

  D.  The Danger to the Community and Risk of Flight

The defendant's repeated participation in anonymous threat calls to Jewish hospitals demonstrates the risk of danger he poses to the community. First responders rushing to the scene endanger the local community which is deprived of adequate responses to actual emergencies. Patients forced to evacuate or prospective patients who cannot check into a facility in lockdown are endangered without access to critical healthcare. But the danger posed by the defendant goes beyond the aforementioned bomb threats. As described above, the defendant admitted to the FBI that he wanted to execute Individual-1, an individual involved in the swatting and bomb threats scheme, by shooting him in the head. Moreover, the photograph depicted above shows that the defendant has a history of violent conduct. The danger posed to the community by the defendant is, accordingly, significant.

    The defendant also represents a risk of non-appearance.  He has gone stretches of time with no permanent address, sleeping in a car (as he reported to the FBI) or staying temporarily with others, including in multiple states.  He has no long-term ties to New York City.  As the prospect of a lengthy term of incarceration incentivizes flight, the defendant's potential maximum statutory penalty of 155 years' incarceration demonstrates that he is a serious risk of flight.  <u>Dodge</u>, 846 F. Supp. at 184-85 (finding possibility of a "severe sentence" heightens the risk of flight).

IV. <u>Conclusion</u>

    The defendant presents a danger to the community and a serious risk of flight that no set of release conditions can mitigate.  For these reasons, the government respectfully submits that the Court should enter a permanent order of detention pending trial.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

          By:  /s/
             Alexander A. Solomon
             Laura Zuckerwise
             Andrew D. Reich
             Assistant U.S. Attorneys
             (718) 254-7000

cc:  Clerk of Court (RER) (by ECF)
    Counsel of Record (by ECF)