**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director*

Michelle A. Gelernt
*Attorney-in-Charge*

July 9, 2025

BY ECF

The Hon. Ramon E. Reyes
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Domagoj Patkovic*, No. 24 Cr. 317 (RER)

Your Honor:

This office represents Defendant Domagoj Patkovic. I respectfully submit this letter in connection with Mr. Patkovic's sentencing, which is scheduled for July 23, 2025, at 11:30 a.m.

On February 19, 2025, Mr. Patkovic pled guilty to one count of conspiracy to make false bomb threats to four Jewish hospitals, in violation of 18 U.S.C. §§ 844(e) & 844(n), and one count of making false bomb threats to the hospital known as Victim-1, in violation of 18 U.S.C. § 1038(a)(1).[1]

## I. BACKGROUND

As Portland, Oregon's Covid-19 pandemic shutdown stretched into its second year, Domagoj Patkovic was experiencing a mental health crisis. He was homeless, with no stable employment, living a transient life principally on the streets or in his car, drinking every day to the point of intoxication, and receiving no medication for his bipolar disorder. He was cycling between depression and mania. He had no friends. His family had long since shunned him.

But Mr. Patkovic had his computer, and he found welcome in a group of outsiders on Discord. The community exchanged anti-Semitic and racist memes, shared obscure in-jokes and jargon, and generally egged each other on to be more offensive. It was hateful and crude, but it was the only community to which Mr. Patkovic felt he belonged.

---

[1] The PSR incorrectly states that Count 17 charges threats against all four hospitals. (*See* PSR ¶ 3).

When Mr. Patkovic was a child, his family abused and rejected him, as the PSR explains in horrific detail, leading him to regularly contemplate suicide. (*See* PSR ¶¶ 47, 56). When he was still a teenager, his mother sent him to a treatment center in Montana. It was the last support he ever received. His mother cut off contact with him for two years (or, as Mr. Patkovic explains it to himself, "he was unable to figure out the bus system" to get back to her), before finally letting him come back home. (PSR ¶ 47). However, Mr. Patkovic's mental health challenges proved too much for the family, and he was made to leave again.

Mr. Patkovic then spent the rest of his adult life, until his arrest in this case, "alone as a homeless and transient adult," bouncing around from state to state, working security and other temporary jobs, drinking, struggling with the brutal highs and lows of his bipolar disorder, and facing seemingly insurmountable difficulties connecting with people (Mr. Patkovic received an Asperger's Syndrome diagnosis when he was 25 years old).

Treated as a fringe person, Mr. Patkovic embraced a fringe persona—punk rock, Paganism, Eastern European ethnocentrism, and, eventually, quasi-neo-Nazi beliefs. The Discord community encouraged this. Eventually, what started as memes led to prank calls, and prank calls led to swatting. Mr. Patkovic joined in, calling in bomb threats himself to at least one Jewish hospital in New York. The Discord chat contemporaneous with the stream of his recorded audio makes clear that the other participants on the server thought his phone call was hilarious. Memes, emojis, and in-jokes celebrate the dialog in real time, offering suggestions and commentary. It was seen as a joke, a group effort at a sick prank by isolated individuals who had inculcated their antisocial behavior in a dark corner of the Internet during the pandemic, until it finally burst into the open.

Of course, it was no joke. The bomb threats were false, but the harm was real. Real people were terrified, real patients potentially put at risk during evacuations, and real law enforcement resources spent unnecessarily. Mr. Patkovic's actions exacerbated a rising tide of anti-Semitism more broadly. He understands he faces significant prison time as punishment because of the harm he caused, and because he and others must be deterred.

One important clarification is required in connection with the PSR's description of Mr. Patkovic's post-arrest statement. The person who Mr. Patkovic colorfully, but metaphorically, said he would shoot in the head if he could was not, as the PSR makes it seem, a mere witness to the swatting. (*See* PSR ¶ 13). Rather, the individual was a child predator. That was the misconduct to which Mr. Patkovic was expressing his antipathy.[2]

---

[2] The PSR also mentions "an unrelated incident" in which Mr. Patkovic is photographed making a Nazi salute above "a man's unconscious body." (PSR ¶ 14). The fact that the incident is "unrelated" is sufficient basis to excise it from the PSR. Mr. Patkovic told local law enforcement he was defending himself against the individual, and charges were not filed. The incident is not relevant. It should be disregarded as a wrongful attempt to paint Mr. Patkovic as a violent person.

## II.     APPLICABLE SENTENCING LAW

A sentencing court is required to consider the factors set forth in 18 U.S.C. § 3553(a) in determining a reasonable sentence in each individual case. *See United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Section 3553(a) directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)," which in turn sets forth that the applicable purposes are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider these additional factors set forth in Section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution.  In every case, the sentencing court "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.

However, the Guidelines range is just one of several factors set forth in Section 3553(a) that a district court must consider when imposing sentence. *See also Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011). A sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted).

The PSR calculates the applicable advisory Guidelines range as 51-63 months. (PSR ¶ 77). This calculation makes two related mistakes. First, it erroneously applies a 2-level use-of-a-minor enhancement, pursuant to U.S.S.G. § 3B1.4 (*see* PSR ¶ 25), because, it claims, "one of the defendant's co-conspirators was 17 years old at the time of the calls," and Mr. Patkovic allegedly "used" that minor "to obtain at least one dummy phone number" that was used to make threats (PSR ¶ 7). Second, the PSR erroneously applies a 2-level aggravating role enhancement pursuant to U.S.S.G. § 3B1.1(c) because, it claims, "the defendant directed the actions" of the same minor "to facilitate the offense." (PSR ¶ 26).

It is true that the minor in question was a co-conspirator. But the defense has seen no evidence that Mr. Patkovic (or anyone else in the conspiracy) "used" the minor to commit the offense, in the sense intended by the Guideline, that is, "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting" the dummy phone number, or anything else, from the minor. U.S.S.G. § 3B1.4 app. n.1. Nor are we aware of any evidence that Mr. Patkovic "directed" the minor to do anything. The PSR cites no such evidence—it simply asserts in conclusory terms that the minor was "used" and "directed" by Mr. Patkovic.

There is no factual basis in the sentencing record to support either Guideline enhancement. The Court should decline to apply them.

With that change, the new total offense level is 18. Using a Criminal History Category of III, the corrected advisory Guidelines range is 33-41 months.

### III.    ARGUMENT

The defense respectfully requests a sentence of 33 months, the bottom of the corrected advisory Guidelines range. Such a sentence would be sufficient, but not greater than necessary, to comport with the purposes of sentencing.

Principally, it would adequately balance Mr. Patkovic's history and characteristics, which Probation observes may warrant a downward variance, with the nature and circumstances of the offense, which Probation suggests may warrant an upward departure. On the one hand, Mr. Patkovic for his whole life has experienced largely untreated mental illness, homelessness, isolation, and rejection by his family. On the other, this vulnerability led him to find belonging in a world of online hate that found humor in terrifying the occupants of several Jewish hospitals and tying up law enforcement resources in doing so. A Guidelines sentence strikes the right balance of these competing factors.

A sentence of 33 months would also avoid unwarranted sentencing disparities with sentences of similar defendants. *E.g.*, *United States v. Florea*, No. 21 Cr. 37 (EK) (in connection with the January 6 riots, defendant threatened officials, including, for example, a threat to Senator-elect Warnock that "2 cars full of armed patriots" were on their way to Washington, D.C., and was found to have ammunition in his home; he was sentenced to 33 months' imprisonment); *United States v. Welker*, No. 23 Cr. 141 (PKC) (defendant, a member of an online Neo-Nazi group, who repeatedly threatened a journalist who reported on the group, including images of the journalist's face with a gun pointed at his head, sentenced to 44 months' imprisonment).

Indeed, the Court may recall that in one of the most famous cases of this kind in New York—in which thousands of people were evacuated from Liberty Island in 2015 due to the defendant's threat to "blow up" the Statue of Liberty—the defendant's mental illness contributed to a stipulated non-incarceratory sentence, which the judge accepted in light of the defendant's progress while on pre-trial release. *United States v. Smith*, No. 16 Cr. 128 (VSB) (S.D.N.Y.) (defendant was subject to a 33-41 month Guidelines range, including two other bomb threats to Times Square and the Brooklyn Bridge, but government stipulated to a time served sentence); *see also* https://www.seattletimes.com/nation-world/man-who-forced-statue-of-liberty-evacuation-avoids-prison/. Mr. Patkovic, by contrast, has not had the opportunity to make such progress. There has been no treatment for him at the MDC. It is therefore unsurprising that the MDC has not addressed—indeed, it has exacerbated—the underlying psychological and social factors contributing to the offense conduct here.

In other words, much of the work to be done by the sentence in this case—with respect to deterrence and rehabilitation, at least—will only occur after Mr. Patkovic is released from prison.

At that point, Mr. Patkovic will have his first opportunity for treatment in his adult life. Also for the first time, Mr. Patkovic will have someone supporting his efforts at shelter, employment, and a medication regimen, not to mention a stable human being providing guidance and advice. In other words, Mr. Patkovic will be given a chance to succeed where previously he slipped through the cracks. A sentence of 33 months reasonably balances the need for punishment and incapacitation with the need to afford Mr. Patkovic that chance sooner rather than later.

In *Smith*, the government had this to say in support of largely supervisory sentence:

> Importantly, the Probation Office will supervise the defendant for three years, and that oversight should deter the defendant from committing additional crimes. Meanwhile, the twin facts that the defendant pleaded guilty to a felony and served approximately three weeks in jail will serve the purpose of not only specific deterrence, but also general deterrence by showing others that there are serious consequences for making hoax threats.

(Letter of AUSA David Zhou, *United States v. Smith*, No. 16 Cr. 128 (VSB), Doc. 26, at 4).

If three weeks in jail followed by three years of supervised release were sufficient in *Smith* to serve the purposes of sentencing for a psychologically compromised person calling in a false bomb threat to Liberty Island (and two more tourist attractions in New York), then almost three *years* in jail followed by three years of supervision is sufficient in this case.

We request a sentence of 33 months.

Respectfully submitted,

/s James Darrow

James Darrow
Assistant Federal Defender
Tel. (718) 407-7419
james_darrow@fd.org

*Attorneys for Domagoj Patkovic*

cc: Counsel of record (by ECF)
U.S. Probation Officer Brian H. Woo (by email)
Chambers of the Hon. Ramon E. Reyes (by email)