

U.S. Department of Justice

United States Attorney
Eastern District of New York

EHS:AAS/LZ/ADR  
F.# 2021R00608

271 Cadman Plaza East  
Brooklyn, New York 11201

July 16, 2025

By ECF

The Honorable Ramon E. Reyes, Jr.  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, NY 11201

        Re:    United States v. Domagoj Patkovic  
              Criminal Docket No. 24-317 (RER)

Dear Judge Reyes:

      The government respectfully submits this letter in advance of the defendant's sentencing, which is currently scheduled for July 23, 2025. For the reasons stated below, the government respectfully requests a sentence at the top of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G") range estimated by the government in the defendant's plea agreement, 51 to 63 months' imprisonment.

I.    Background

      The facts underlying the offense conduct are set forth in the June 17, 2025 Presentence Investigation Report ("PSR").

    A.    The Offense Conduct

      As set forth in the PSR, the defendant is responsible for making at least six hoax bomb threat phone calls to historically Jewish hospitals and care centers in the Eastern District of New York and elsewhere, beginning at least as early as May 2021. PSR ¶ 4. The defendant live-streamed these threat calls to an audience using a social media platform, so that untold numbers of participants could hear the calls as well. *Id.*

      While the defendant conspired with others to place the threat calls, the defendant himself spoke on the calls. In one call, on May 18, 2021, the defendant threatened to "kill all k\*\*\*s," using a slur for Jewish individuals, and stated that he had placed bombs all around the hospital. NYPD responded and conducted a room-by-room sweep of all 13 floors of the hospital building to check for explosive devices. *Id.* at ¶ 5.

On another occasion, on September 15, 2021, the defendant again spoke with a phone operator at a historically Jewish hospital in Nassau County, New York. The defendant stated, "I'm gonna blow you to bits, you f***ing k**e bitch," again using a slur for Jewish individuals. *Id.* at ¶ 10. Officers from the Nassau County Police Department responded to the scene, causing a partial evacuation and a lockdown of the entire hospital. *Id.* Several similar bomb threats are described in the PSR.

The defendant was interviewed by law enforcement agents. During the interview, along with confessing to participating in swatting and bomb threat calls, the defendant threatened to murder one of the individuals who was involved in the bomb threat calls, stating, "I would f***ing shoot that f***ing fat half [indecipherable] in the head with a gun if I could." *Id.* at ¶ 14. Law enforcement agents also obtained a photograph of the defendant crouching above a man's unconscious body, making a Nazi salute hand gesture. During the defendant's interview, he admitted to assaulting the man, though he claimed he acted in self-defense.[1] *Id.*

These phone calls caused substantial disruption to hospital operations. As detailed in the PSR, hospital personnel were pulled away from their day-to-day activities to allow the police to conduct numerous lockdowns, sweeps, and in one instance a partial evacuation, substantially disrupting patient care and endangering victims. *Id.* ¶ 10.

The defendant's actions fed a rising tide of antisemitism in America, as the defendant acknowledges in his own submission. *See* Def. Mem. at 2. Hate crimes directed against Jewish Americans have dramatically increased in frequency in recent years,[2] rising from a total of 912 in 2014 to 3,697 in 2022. Between October 2023 and January 2024 alone, 3,291 antisemitic events were reported by the Anti-Defamation League.[3] In just the last few months, Jewish Americans have been subjected to deadly acts of terrorism. In April, Pennsylvania Governor Josh Shapiro's residence was set on fire. On May 21, 2025, two Jewish people were fatally shot outside the Capital Jewish museum in Washington, D.C. And on June 1, 2025, just a

---

[1] The defendant asks that the PSR's reference to this photograph be disregarded because it was from an unrelated incident. *See* Def. Mem. at 2 n.2. However, the defendant does not allege that anything about the reference is inaccurate (it is not) and the reference is highly relevant to understanding the antisemitic motives of the defendant's conduct. The defendant was not merely aiming to provoke others for entertainment; he was advancing his longstanding and pre-existing hateful agenda.

[2] *See* Callum Sutherland, *The Rise of Antisemitism and Political Violence in the U.S.*, Time, June 2, 2025, available at https://time.com/7287941/rise-of-antisemitism-political-violence-in-united-states/ (last viewed July 10, 2025).

[3] *See U.S. Antisemitic Incidents Skyrocketed 360% in Aftermath of Attack in Israel, according to Latest ADL Data*, Jan. 9, 2024, available at https://www.adl.org/resources/press-release/us-antisemitic-incidents-skyrocketed-360-aftermath-attack-israel-according (last viewed July 10, 2025).

few weeks ago, a suspect in Colorado used a flamethrower and Molotov cocktails to set people on fire at an event focused on the hostages in Gaza, killing one person and injuring many others.

The rise of antisemitism among younger Americans is particularly notable, and has been found to coincide with surges of antisemitic hate speech on social media platforms.[4] "Sometime in the mid-2010s, antisemitism exploded on social media, as these networks assumed a more dominant position in our personal lives and drove the polarization of our current politics." By 2024, "antisemitism in the United States [was] at its highest point on record."[5]

B.  Procedural History

On August 5, 2024, a federal grand jury returned an indictment charging the defendant with 23 counts related to the above-described bomb threats. The defendant pleaded guilty on February 19, 2025, pursuant to a plea agreement, to Counts Two and Seventeen of the indictment, which charge, respectively, conspiracy to maliciously convey false information concerning explosives in violation of 18 U.S.C. § 844(n) and false information and hoaxes in violation of 18 U.S.C. § 1038(a)(1).

II.  Applicable Law

The Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in *Booker* that the sentencing court must consider the Guidelines in formulating an appropriate sentence. *Id.* In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted).

Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not

---

[4]   *See The Rise of Antisemitism and Political Violence in the U.S.*; *see also* Sheera Frenkel and Steven Lee Myers, *Antisemitic and Anti-Muslim Hate Speech Surges Across the Internet*, New York Times, November 15, 2023, available at https://www.nytimes.com/2023/11/15/technology/hate-speech-israel-gaza-internet.html (last viewed July 10, 2025).

[5]   Noa Tishby, *How Social Media Stokes Antisemitism and What We Can Do About it*, American Bar Association, December 2024, available at https://www.americanbar.org/groups/crsj/resources/human-rights/2024-december/how-social-media-stokes-antisemitism/ (last visited July 10, 2025).

presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (citation and footnote omitted). Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[.]" 18 U.S.C. § 3553(a)(2).

III. Guidelines Calculation

The government respectfully submits that the Guidelines calculation set forth below, which differs slightly from both the PSR's calculation and the estimate reflected in the defendant's plea agreement, is the proper calculation.[6] The government nevertheless seeks a sentence of 63 months' imprisonment, the top of the Guidelines range set forth in the plea agreement.

Count Two: Victim-1, Victim-2, Victim-3, Victim-4

| | | |
|---|---|---:|
| | Base Offense Level (§§ 2A6.1(a)(1), 3D1.2) | 12 |
| Plus: | More Than Two Threats (§ 2A6.1(b)(2)) | +2 |
| Plus: | Offense Resulted in Substantial Disruption of Public, Governmental, or Business Functions or Services (U.S.S.G. § 2A6.1(b)(4)) | +4 |
| Plus: | Hate Crime Motivation (§ 3A1.1(a)) | +3 |
| Plus: | Vulnerable Victim (§ 3A1.1(b)) | +2 |
| Plus: | Using a Minor to Commit a Crime (§ 3B1.4) | +2 |
| Plus: | Aggravating Role (§ 3B1.1(c)) | +2 |
| | Total: | <u>27</u> |

---

[6] The Guidelines estimate in the defendant's plea agreement did not include an enhancement for substantial disruption of services, and calculated the defendant's criminal history score as falling in Category I instead of Category III. On further investigation, the government agrees with Probation on both of these points.

Count Seventeen: Victim-1

| | | |
|---|---|---:|
| | Base Offense Level (§§ 2A6.1(a)(1), 3D1.2) | 12 |
| Plus: | More Than Two Threats (§ 2A6.1(b)(2)) | +2 |
| Plus: | Hate Crime Motivation (§ 3A1.1(a)) | +3 |
| Plus: | Vulnerable Victim (§ 3A1.1(b)) | +2 |
| Plus: | Using a Minor to Commit a Crime (§ 3B1.4) | +2 |
| Plus: | Aggravating Role (§ 3B1.1(c)) | +2 |
| | Total: | <u>23</u> |

| Grouping Analysis (§§ 3D1.1, 3D1.2, 3D1.4) | Units | Level |
|---|:---:|:---:|
| Group 1: Count 2 (Victim-1), Count Seventeen | 1 | 27 |
| Group 2: Count 2 (Victim-2) | 1 | 23 |
| Group 3: Count 2 (Victim-3) | 1 | 23 |
| Group 4: Count 2 (Victim-4) | 1 | 23 |
| Group with Highest Offense Level: Group 1 (§ 3D1.4) | | 27 |
| Adjustment for Multiple Units (§ 3D1.4) | | <u>+4</u> |
| Combined Adjusted Offense Level | | <u>27</u> |
| Less:   Acceptance of Responsibility (§§ 3E1.1(a)-(b)) | | <u>-3</u> |
| Total Adjusted Offense Level: | | <u>24</u> |

An offense level of 24 and Criminal History Category III carry a Guidelines sentence of 63 to 78 months' imprisonment.

    A.    <u>The Government's Objections to the Calculation in the PSR</u>

The government objects to two aspects of Probation's Guidelines calculation in the PSR. *First*, the PSR fails to include a two-point enhancement for targeting vulnerable victims. PSR ¶¶ 19-31. The defendant stipulated to this enhancement in his plea agreement. Such an enhancement is applicable because the defendant "knew or should have known that a victim of the offense was a vulnerable victim." *See* U.S.S.G. § 3A1.1(b)(1). Under that Section, "vulnerable victim" means "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, [or] physical or mental condition." *See* U.S.S.G. § 3A1.1,

5

Application Note 2.  The defendant could have targeted synagogues, Jewish residences, historically Jewish colleges or Jewish recreation centers; instead, he chose historically Jewish hospitals and elderly care centers, definitionally filled with individuals who were particularly vulnerable due to their age and physical condition.  As a result of the defendant's conduct, those individuals experienced tangible disruptions in needed care.  The application notes to Section 3A1.1 specifically instruct that "[t]he adjustments from subsections (a) and (b) [referring to hate crime motivation and vulnerable victims, respectively] are to be applied cumulatively.  Do not, however, apply subsection (b) in a case in which subsection (a) applies unless a victim of the offense was unusually vulnerable for reasons unrelated to race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation." *See* U.S.S.G. § 3A1.1, Application Note 3.  Such is the case here.

*Second*, the PSR improperly groups the Guidelines calculation for Counts Two and Seventeen into one single group.  PSR ¶ 20.  The Guidelines instruct that all relevant conduct be accounted for, and the defendant was charged with substantive threat offenses as to each of Victim-1 through Victim-4.  In the case of multiple separately charged threats to different victims, the Guidelines instruct that, "[f]or purposes of Chapter Three, Part D (Multiple Counts), multiple counts involving making a threatening or harassing communication to the same victim are grouped together under §3D1.2 (Groups of Closely Related Counts).  Multiple counts involving different victims are not to be grouped under §3D1.2." *See* U.S.S.G. § 2A6.1, Application Note 3.  Because Count Two addresses the defendant's conduct as to Victim-1 through Victim-4, and Count Seventeen only encompasses the defendant's conduct as to Victim-1, the proper grouping analysis groups Counts Two and Seventeen only as to Victim-1, and creates additional groups for Count Two's conduct as to each additional victim, as outlined above.  *See* U.S.S.G. § 3D1.2, Application Note 8 ("Example: The defendant is convicted of two counts: conspiring to commit offenses A, B, and C, and committing offense A.  Treat this as if the defendant was convicted of (1) committing offense A; (2) conspiracy to commit offense A; (3) conspiracy to commit offense B; and (4) conspiracy to commit offense C.  Count (1) and count (2) are grouped together under §3D1.2(b).  Group the remaining counts, including the various acts cited by the conspiracy count that would constitute behavior of a substantive nature, according to the rules in this section.").

      B.      <u>The Defendant's Objections to the Calculation in the PSR</u>

The defendant contends that the two-point enhancement for using a minor to commit the offense, under U.S.S.G. § 3B1.4, should not be included because "the defense has seen no evidence that Mr. Patkovic . . . 'used' the minor to commit the offense."  The government submits that this enhancement was appropriately applied.  Application Note 1 to U.S.S.G. § 3B1.4 defines "used or attempted to use" to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting."  In this case, a minor registered a TextNow phone number that was used to place the call on which the defendant spoke on May 18, 2021.  A search warrant affidavit describing this was produced to the defendant, and the relevant portions are Bates-labeled SDM000295-296.  Based on this affidavit, the minor admitted "to creating the account associated with the 3636 Phone for PATKOVIC and [another co-conspirator], among others, to use for the bomb threat calls in May 2021, and to helping identify potential targets for the hoax bomb threat calls.  He further stated that he frequently communicated with PATKOVIC and [another co-conspirator] about the bomb

6

threat calls through . . . electronic text-messaging and voice chatting applications." SDM000295. Since the TextNow phone number was an instrumentality of the call during which the defendant spoke and made bomb threats, and the TextNow phone number was obtained by a minor and provided to the defendant to make the call, it follows that the defendant used a minor to commit the crime.

The defendant also contends that the two-point aggravating role enhancement under U.S.S.G. § 3B1.1(c) is improper. *See* U.S.S.G. § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in subsection (a) or (b), increase by 2 levels."). However, the defendant himself concedes that he made swatting and bomb threat calls as part of a "group effort" in which other members of the group joined in real time and offered suggestions to assist him in carrying out the threats. Def. Mem. at 2. The defendant either accepted or rejected the suggestions, ultimately deciding how the calls would be conducted. By his conduct, he clearly appeared to be a leading member of the group. For example, following one call, the defendant chastised members of the group for interfering with the call and then asked the group, "who's next," implying that he could enable others to take turns. *See* DP000017. As described above, the defendant also relied on others to obtain dummy phone numbers he used to make the calls. It is clear that the defendant was an "organizer" of the calls.

IV.   A Significant Sentence is Appropriate

A substantial sentence of incarceration is warranted to account for the nature and seriousness of the defendant's criminal offenses, to promote respect for the law, and to account for the need to provide for both specific and general deterrence. *See* 18 U.S.C. § 3553(a). For these reasons, the government respectfully submits that a sentence at the top of the Guidelines range of imprisonment that it initially estimated, 63 months, is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

As an initial matter, the seriousness of the instant offense favors a significant sentence. The defendant called in numerous hoax bomb threats to multiple historically-Jewish hospitals in a short period of time. As a result of the defendant's conduct, hospitals were repeatedly forced to divert significant resources away from patient care while law enforcement searched the hospitals room by room and floor by floor, to ensure that the hospitals were free from explosive devices. Indeed, the hoax bomb threats were, by design, meant to disrupt, distract, and harass historically Jewish hospital and their patients. Hoax threats like these not only waste limited resources but can cause real panic that can put people in real danger.

The defendant's conduct is especially egregious because the defendant amplified and exacerbated the hate speech in his threats by broadcasting them live to an audience over a social media platform, as he acknowledges. The defendant agrees that by broadcasting his calls over a social media platform, the defendant had a live audience that "celebrate[d] the dialog in real time, offering suggestions and commentary." Def. Mem. at 2. Here, a significant sentence will help to deter the defendant and others from making antisemitic threats to institutions by sending a message that such threats are taken seriously. General deterrence is essential given the surge in antisemitic incidents in recent years.

Moreover, a significant sentence is further warranted to ensure the defendant, specifically, is deterred from committing new crimes. The defendant has numerous prior convictions that sound in fraud or violence. *See* PSR ¶¶ 33-34. For instance, the defendant was convicted of brandishing an imitation firearm (PSR ¶ 33), carrying a concealed dirk or dagger (PSR ¶ 34), carrying a false identification document (PSR ¶ 35), and discharging a firearm (PSR ¶ 37). The defendant's pattern of continuing criminal conduct, despite multiple arrests, convictions, and sentences, demonstrates that a substantial incarceratory sentence is necessary to protect the public and to deter the defendant.

The defendant argues that a sentence of 33 months is appropriate here to ensure that the defendant's sentence avoids unwarranted sentencing disparities vis-à-vis sentences of other, similarly-situated defendants. But two of the three cases offered by the defendant in fact support a significant sentence for the defendant. In *United States v. Florea*, the defendant was charged with being a felon in possession of a weapon and with making violent threats against Senator Raphael Warnock. The threats, while deplorable, were to a single named victim and did not involve hate speech. Nevertheless, the district court sentenced the defendant to a sentence of 33 months, well *above* the applicable Guidelines range of 15-21 months. *See United States v. Florea*, Case No. 21-CR-37 (EK), ECF Nos. 52, 56. Similarly, in *United States v. Welker*, the defendant—a leader of a Neo-Nazi group who threatened a journalist who reported on the group—was sentenced to a term of imprisonment of 44 months, *above* the Guidelines range of 30 to 37 months. *See United States v. Welker*, 23-CR-141 (PKC), ECF Nos. 38.[7] A sentence at the high end of the Guidelines estimated by the government in the defendant's plea agreement is entirely consistent with both *Florea* and *Welker*, given the upward departures applied by the district court in both cases.

V.      Restitution and Related Fines

The defendant is also responsible for making restitution to his victims. However, because the calculation of those costs has not yet been completed, *see* PSR ¶ 88, the government requests additional time to provide its position to the Court. *See* 18 USC § 3664(d)(5) ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

Finally, for the defendant's violations of 18 USC § 1038(a)(1), the Court "shall order the defendant to reimburse any state or local government, or private not-for-profit organization that provides fire or rescue service incurring expenses incident to any emergency or investigative response to that conduct, for those expenses." *See* 18 USC § 1038(c)(1). The

---

[7]    The third case cited by the defense—*United States v. Smith*—is inapposite. In that case, the government sought a non-incarceratory sentence below the Guidelines range of 33-41 months. The threats do not appear to have involved hate speech, and the government emphasized the defendant's hearing disability. Moreover, portions of the government's sentencing submission are redacted, indicating that there may have been considerations in that case to warrant a downward departure that are not relevant here. *See United States v. Smith*, Case No. 16-CR-128 (VSB), ECF No. 26.

government is not aware of any such costs at this time but requests that it be permitted to provide the Court with an update together with its restitution position.

VI.     Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 63 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/_____
        Alexander Solomon
        Laura Zuckerwise
        Andrew Reich
        Assistant U.S. Attorney
        (718) 254-6204

cc:     Clerk of Court (RER) (by ECF)
        U.S. Probation Officer (by Email)